UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA and
STATE OF MICHIGAN, ex rel,
DEBORAH J. SMITH,

Plaintiff-Relator,

v

CIENA HEALTHCARE MANAGEMENT, INC., d/b/a an Assumed Name, AUTUMNWOOD OF LIVONIA, a Michigan for-profit corporation, MOHAMMAD QAZI, SEEMAB KHAN, M.D., d/b/a SEEMAB KHAN MD PC, and CHAYANIKA PAUL,
Jointly and Severally

Defendants.

_______________________________________/

Case No. 09-

Hon.

**<u>MATTER FILED IN CAMERA AND UNDER SEAL</u>**

HERTZ SCHRAM PC
By: Patricia A. Stamler (P35905)
Attorneys for Plaintiff-Relator
1760 S. Telegraph Road, Suite 300
Bloomfield Hills, MI 48302-0183
(248) 335-5000

_______________________________________/

**<u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>**

NOW COMES Plaintiff-Relator, Deborah J. Smith, for herself and on behalf of the United States of America and the State of Michigan, by and through her attorneys, HERTZ SCHRAM PC, hereby files this Complaint under the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq*., the False Claims Recovery Act of 2009 ("FERA"), 31 U.S.C. §§ 3729-3733, the

Civil Monetary Penalties Law, 42 U.S.C. §§ 1320a-7(b)(7) and 1320a-7a, and the Michigan Medicaid False Claims Act, MCL 400.601 *et seq.* ("Acts") and states as follows:

**JURISDICTION AND VENUE**

1. This action arises under 31 U.S.C. § 3729 *et seq.*, as amended in 2009, MCLA 400.604 *et seq.*, also known as the Michigan Medicaid False Claims Act (the "Acts"), and the common law to recover treble damages and civil penalties on behalf of the United States of America and the State of Michigan arising out of the Defendants' submission of fraudulent claims to the United States and the State of Michigan Governments through the federal Medicare and the federal and state Medicaid program.

2. 31 U.S.C. § 3732 provides that this Court has exclusive jurisdiction over actions brought under the federal False Claims Act and concurrent jurisdiction over state claims arising from the transactions giving rise to the claims under such Act. In addition, jurisdiction over this action is conferred on this Court by 28 U.S.C. § 1345 and 28 U.S.C. § 1331 because this civil action arises under the laws of the United States. Further, this Court has jurisdiction under 31 U.S.C. § 3732(b) over any action brought under the laws of any state for the recovery of funds paid by state or local government if the action arises from the same transaction or occurrence as an action brought under § 3732.

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391 and § 3732(a) of the Act which provides that "any action under 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant can be found, resides, transacts business, or in which any act prescribed by § 3729 occurred." The acts which are the

subject of this action, occurred in the Eastern District, including the City of Livonia, in the State of Michigan, within this judicial district.

4. Under the False Claims Act, this complaint is to be filed in-camera and remain under seal for a period of at least sixty (60) days and under the Medicaid False Claims Act the complaint is to be filed in-camera and remain under seal for a period of at least ninety (90) days and shall not be served on Defendants until the Court so orders. The federal government may elect to intervene and proceed with the action within sixty (60) days after it receives both the Complaint and the material evidence and the state government may elect to intervene and proceed with the action within ninety (90) days after it receives both the Complaint and the material evidence.

5. As required under § 3730(a)(2) of the federal Act, Relator has provided to the Attorney General of the United States and to the United States Attorney for the Eastern District of Michigan, prior to the filing of this Complaint, statements of all material evidence and information related to the Complaint (the "Evidentiary Disclosure"). Relator has also provided the Attorney General of the State of Michigan a copy of the Evidentiary Disclosure.

6. Relator is the original source of the information of the allegations contained in this Complaint.

7. This is also an action to obtain damages, assessments, civil monetary penalties, and exclusion from all federal health care programs pursuant to 42 U.S.C. §§ 1320a-7(b)(7) and 1320a-7a, which provisions are known as the Civil Monetary Penalties Law ("CMPL").

## PARTIES

8. Defendant Ciena Healthcare Management, Inc. ("Ciena") d/b/a an assumed name, Autumnwood of Livonia, is a for-profit Michigan corporation doing business in the City of Livonia, located in the Eastern District of Michigan.

9. Defendant Mohammad Qazi ("Qazi") is, for all times relevant to this Complaint, the President/CEO of Defendant Ciena and is a resident in the Eastern District of Michigan.

10. Defendant Seemab Khan, M.D. ("Khan") is, for all times relevant to this Complaint, a medical doctor licensed to practice medicine in the State of Michigan and is a resident in the Eastern District of Michigan and is doing business as Seemab Khan, M.D., P.C., with its principal place of business located in the City of Livonia, in the Eastern District of Michigan.

11. Defendant Chayanika Paul ("Paul") is, for all times relevant to this Complaint, an employee of Defendant Khan and is a resident in the Eastern District of Michigan.

12. Relator Deborah J. Smith is, for all times relevant to this Complaint, a resident of the City of Dearborn, in the Eastern District of Michigan.

## GENERAL ALLEGATIONS

13. Defendant Ciena was formed in spring 1999 to provide management support to long-term care facilities owned by Defendant Qazi.

14. From about 1999 to 2009, Defendant Ciena grew from a four person team to an organization that provides support to facilities employing over 3,000 people and services over 2,500 residents and families.

15. Defendant Ciena also provides the following Management Services to its customers:

a. Operations Management;
b. State and Federal Compliance Consultation;
c. Medicare, Medicaid, and Managed Care Billing;
d. Financial Management;
e. Vendor Management;
f. Payroll Services;
g. Human Resources Consultation;
h. Recruiting Services;
i. Legal Consultation;
j. Internal Auditing; and
k. Training/Education Programs.

16. Defendant Ciena's managed facilities routinely provide progressive skilled nursing and rehabilitative services such as:

a. Rehabilitative Services (including Sub-Acute);
b. Ventilator Care;
c. Infectious Disease Services;
d. Progressive Wound Care & Treatment;
e. Intravenous Therapy (including PPN/TPN, antibiotic therapies); and
f. Respiratory Care.

(www.cienafacilities.com)

17. Historically, Defendants Ciena and Qazi were alleged to have improperly billed Medicaid and Medicare for care at four nursing homes, three located in Detroit and one located in Whitmore Lake.

18. Defendant Qazi also owns many of the nursing homes where his company provides services, including Autumnwood.

19. Defendant Qazi bought the Autumwood facility around 1989 or 1990.

20. Defendants Qazi and Khan are related and have been affiliated for years.

21. Defendant Khan had served as Autumnwood's Medical Director until January or February 2008 when she was asked to step-down.

22. Dr. Najam Syed, M.D., replaced Defendant Khan as the Medical Director of Autumnwood in August 2008.

23. To the best of Relator's knowledge, Autumnwood operated without a Medical Director from January/February 2008 until August 2008.

24. Dr. Syed is Mr. Ziolkowski's personal physician.

25. During Defendant Khan's role as Autumnwood's Medical Director, the State's Annual Survey in 2008 revealed 33 citations arising out of a lack of medical oversight.

26. On or about September 2008, Relator responded to a job ad in The Detroit News for a Director of Nursing position at Defendant Ciena's Autumnwood of Livonia.

27. The ad advised applicants to contact Ciena's Regional Director, Letty Azar, located at 4000 Town Center, Southfield, MI or the site administrator at Autmunwood.

28. Relator interviewed at Autumnwood with the site administrator, Giles Ziolkowski, on or about the last week in September 2008.

29. Shortly thereafter, Relator interviewed with Ms. Azar.

30. Relator commenced her job as the Director of Nursing on October 13, 2008.

31. Relator was responsible for the direction of the 142-bed skilled nursing facility's nursing department in western Wayne County.

32. Relator's responsibilities included the implementation of processes and procedures necessary to the delivery of nursing care to a primarily geriatric population with all

the complicating health care issues in compliance with state regulations, federal regulations and conditions of participation in government funded benefits.

33. During Relator's employment with Defendant Ciena, the census at Autumnwood on any given day was approximately 120-130 patients.

34. During Relator's employment with Defendant Ciena, approximately 70 to 80 patients had Medicaid coverage, approximately 25-30 patients had Medicare funding and the balance of the patients had private pay coverage.

35. During the course of her employment at Autumnwood, Relator worked alongside Defendant Khan, M.D.

36. In January 2009, Defendant Khan began complaining to Defendant Qazi that she was not assigned enough patients at Autumnwood stating that she was assigned roughly 50 patients.

37. Defendant Qazi, in response to Defendant Khan's complaint, went to Autumnwood and met with Mr. Ziolkowski, Ms. Terri Emrich, Admissions Director and Relator and informed them of Defendant Khan's complaint, and he sought information about the number of patients assigned to Defendant Khan.

38. The investigation revealed that in January 2009, Defendant Khan had 83 patients assigned to her care.

39. Defendant Khan did not have a set time of the day when she conducted rounds on her patients at Autumnwood.

40. Defendant Khan saw some Autumnwood patients three times a week and others she saw only one time per week.

41. On several occasions, "Dr. Paul" (Defendant Paul) would round for Defendant Khan at Autumnwood, taking her call, giving orders for patients and executing patient orders.

42. Relator later learned Defendant Paul's first name is Chayanika.

43. During her initial interactions with Defendant Paul, Relator was lead to believe that she was a medical doctor licensed to practice medicine in Michigan.

44. On or about March 5, 2009, the State of Michigan commenced an investigation of Autumnwood regarding approximately 35 complaints lodged by the residents, families of residents or via self-report.

45. The State of Michigan's Bureau of Health Services, Complaint Investigation Team was comprised of the Licensing Officer, Toni Ellis, Ms. Janice Barnes, Lead Surveyor and Ms. Victoria Bryan, Surveyor.

46. Some of the complaints under investigation dated back to May 2008 and most involved allegations of substandard care of the residents.

47. Unbeknownst to Relator initially, one complaint, lodged in July or August 2008, pertained to a resident named MC, stating that someone in Autumnwood was impersonating a physician and that the person was working with Defendant Khan.

48. The State of Michigan sought to review MC's records.

49. Relator was assigned the task of reviewing MC's records with the State of Michigan.

50. Relator reviewed the patient's records and it appeared to her that MC had serious medical issues, necessitating multiple hospitalizations at St. Mary Hospital.

51. Relator's review of the record did not raise any red flags and it appeared to Relator that MC had received appropriate care.

52. After she reviewed MC's records, on or about March 10, 2009, Relator was then told of the allegation that someone provided direct care to MC acting as a "physician" but the person was not a physician.

53. Ms. Barnes asked Relator who was responsible for the review of the professionals' credentials working at Autumnwood.

54. Relator advised Ms. Barnes that the responsibility for credential review was assigned to Defendant Ciena's Administrator and Medical Director.

55. Ms. Barnes requested Relator to produce the credential files for Defendants Khan and Paul.

56. On or about March 10, 2009, Relator learned for the first time that there was an allegation that Defendant Paul might not be licensed as a physician.

57. On or about March 10, 2009, Mr. Ziolkowski, the Administrator was out of the country on vacation.

58. Relator secured the credential files on Defendants Khan and Paul.

59. Relator reviewed Defendant Paul's file and it was conspicuously bare.

60. Relator called Ms. Emrich and requested that she contact Defendant Khan's office and ask that she immediately forward Defendant Paul's credentials.

61. Ms. Emrich received a document from Defendant Khan's office that she provided to the investigation team, but not to Relator.

62. Relator was then sent with Ms. Bryan to assist on an investigation into a wound care issue.

63. Subsequent to completing this task, Relator went to a conference room with Ms. Bryan.

64. Relator observed Ms. Barnes and Ms. Azar were in Mr. Ziolkowski's office and that they were laughing.

65. Shortly thereafter, Ms. Barnes informed Relator that the complaint against Defendant Paul was not substantiated.

66. On or about March 10, 2009, Ms. Azar called Relator and Ms. Emrich into a meeting.

67. Ms. Azar told Relator and Ms. Emrich that they have a huge problem and that her disclosure about the problem was not to leave the room.

68. Ms. Azar told Relator and Ms. Emrich that from then on only Defendant Khan can see her patients at Autumnwood and Defendant Paul cannot see Dr. Khan's patients on her own.

69. Relator asked Ms. Azar whether Defendant Paul had appropriate credentials.

70. Ms. Azar would not answer the question directly.

71. Relator pressed Ms. Azar to respond noting that the nurses under her supervision had been receiving orders from Defendant Paul and that they were executing her orders.

72. Ms. Azar would only state to Relator that she was handling the situation and that Defendant Paul would no longer be seeing patients on her own at Autumnwood.

73. Defendant Ciena, through Defenant Khan, was illegally billing Medicare and Medicaid for Defendant Paul's services as a physician when she was not a licensed physician.

74. On or about March 10, 2009, Ms. Azar requested Relator to contact Defendant Khan and ask her to attend a meeting with Ms. Azar as soon as possible.

75. On or about March 10, 2009, Ms. Azar told Relator that she was livid about the situation with "Dr. Paul" and that she intended to take care of the issue.

76. Ms. Azar stated that Mr. Ziolkowski was due back on Monday, March 16, 2009, and she would address it with him then.

77. On or about March 11, 2009, Ms. Barnes returned to Autumnwood to complete her investigation.

78. On or about March 11, 2009, Ms. Barnes reviewed additional medical records and left Autumnwood at about 1:30 p.m.

79. Prior to her departure from the building, Ms. Barnes informed Relator that she had reviewed all of the allegations and that she had determined that none of them were substantiated.

80. Relator became concerned with Ms. Barnes' feedback in light of the fact that she had learned that "Dr. Paul" was not a licensed doctor.

81. On or about March 11, 2009, Relator and Ms. Azar discussed "Dr. Paul's" lack of license again.

82. Relator sought confirmation that Ms. Azar was going to take care of the problem.

83. Ms. Azar assured Relator that she would take care of the problem.

84. Relator further stated to Ms. Azar that if there is even a hint of fraud, the she needed to call the COO, Christine Halsey and Mary Bold, Corporate Compliance.

85. Ms. Azar told Relator that she was taking care of the problem and that the wheels were turning.

86. On or about Monday, March 12, 2009, Mr. Leon Bush, was introduced to Relator and others as having joined Ciena as the new Assistant Administrator for the organization's Manor of Farmington.

87. On or about March 16, 2009, Mr. Ziolkowski returned to the office.

88. On or about March 17, 2009, Relator called Ms. Azar and asked to meet with her that day.

89. At approximately 1:30 p.m. on or about March 17, 2009, Ms Azar came to Autumnwood.

90. On or about March 17, 2009, Relator went to the main conference room for the daily "round-up meeting" to address the issues of the day.

91. After the round-up meeting concluded, Ms. Azar came to the main conference room and asked to meet with Relator and Mr. Ziolkowski.

92. Mr. Anthony Oddo entered the conference room and Ms. Azar and Mr. Ziolkowski left the room, leaving Relator and Mr. Oddo alone in the conference room.

93. Mr. Oddo informed Relator that an LPN, who had been fired for cause, completed an exit survey and claimed that Relator was a racist, stating she only hired White nurses and fired only Black nurses.

94. Relator denied the accusations and informed Mr. Oddo that two residents had filed complaints against the LPN, alleging failure to provide care including failure to provide pain medication.

95. Per Defendant Ciena's protocol when an allegation of abuse or neglect is lodged against an employee he/she is suspended pending investigation.

96. The allegations against this LPN were lodged by the company's Unit Manager, not Relator.

97. Relator, in keeping with Defendant Ciena's policy, suspended the LPN.

98. She notified the LPN of the suspension by phone.

99. The LPN called Relator several derogatory names and claimed that this was a plot to get rid of all the Black nurses and to replace them with all of Relator's White friends, that she would not be coming back to work and that she did not need the job.

100. Despite the phone conversation she had with the LPN, Relator endeavored to investigate the complaint and tried to reach her by phone again.

101. The LPN did not respond to messages and after a week elapsed, Relator informed the LPN by letter that her job was terminated because she had refused to cooperate with the investigation per Ciena's policy.

102. The decision to terminate the LPN was reviewed and supported by Messrs. Ziolkowski and Oddo.

103. The LPN's termination occurred at the end of February 2009, roughly two to three weeks prior to Relator's meeting with Mr. Oddo in March 2009.

104. During Relator's tenure she had hired approximately 37 employees, some were Black and some were White.

105. Mr. Oddo also told Relator that the former LPN had complained about a photo depicting the girlfriend of Relator's son with former President Bush and Mrs. Bush.

106. Mr. Oddo told Relator to get rid of the photo and placed her on a Performance Improvement Plan (PIP), requiring her to meet weekly to increase morale in the building.

107. Mr. Oddo requested that she and Mr. Ziolkowski come to corporate headquarters for a meeting.

108. The PIP was unwarranted and was issued in retaliation for Relator's complaints about Defendant Paul's lack of licensure and her efforts to report this violation of the law.

109. After the meeting with Mr. Oddo concluded, later that same day, Relator met with Mr. Ziolkowski.

110. Mr. Ziolkowski told Relator that they would both be going to "corporate" the following week.

111. Relator told Mr. Ziolkowski that she would not be going with him next week and that she had been falsely labeled a racist.

112. Mr. Ziolkowski told Relator he did not believe she was a racist.

113. On or about March 18, 2009, Relator called Mr. Ziolkowski and informed him that she would not be returning to work, that she could not be a party to wrongdoing and that she was being thrown under the bus.

114. She reminded Mr. Ziolkowski that she had received training at the time of her hire with Ciena about the Corporate Integrity Agreement and she did not intend to breach it.

115. Shortly after Defendant Ciena constructively discharged Relator, Mr. Oddo sent a letter to her dated March 26, 2009, stating in part that she acted in an "unprofessional manner" by resigning without notice and "failing to exercise due care and failing to supervise others" and that her action was reportable to the state Nursing Board under provisions of the Public Health Code, MCL 333.16221 and that Defendant Ciena's policy was to report code violations to the Nursing Board on behalf of licensed individuals who worked with Relator. The letter further invited Relator to report compliance concerns to the company's hotline.

116. Relator's departure was due to a constructive discharge.

117. Relator did not engage in any unprofessional conduct.

118. Shortly after Relator's constructive discharge, Defendant Ciena lodged a complaint against Relator with the State Licensing Board

119. Relator was not served with Defendant Ciena's Complaint to the State Licensing Board.

120. Shortly after May 14, 2009, Relator received a letter from Ms. Sherri Johnson, Manager Allegation Section, Health Regulatory Division of State of Michigan's Department of Community Health advising her that "Some time ago an allegation was filed against you with this office. After a thorough review of the matter, **that a violation of the Public Health Code cannot be established. Accordingly, our file has been closed.**"

**COUNT I**
**FALSE CLAIMS ACT – PRESENTATION OF FALSE CLAIMS**

121. Relator incorporates by reference Paragraphs 1 though 120 of this Complaint.

122. Defendants knowingly presented or caused to be presented to the United States and State of Michigan governments false or fraudulent claims for payment or approval, which

claims were false or fraudulent by virtue of Defendants' violation of the Medicare and Medicaid statutes and regulations the CMPL contrary to Defendants' simultaneous certification, or implied certification, to the United States and State of Michigan governments that Defendants were in compliance with the Medicare and Medicaid laws and other federal and state health care laws, thereby violating the False Claims Act and the Michigan Medicaid False Claims Act.

123. As depicted in the detailed General Allegations, Defendants submitted false statements to the federal and state governments including:

a. Billing for physician services when a physician did not provide services.

b. Operating Autumnwood without a Medical Director.

c. Allowing a non-physician to pose as a physician placing patients' safety at risk.

d. Billing Medicare and Medicaid for services not provided to patients.

124. The United States government and the State of Michigan were unaware of Defendants' improper and illegal conduct and made full payment on or approved the false or fraudulent claims, which resulted in damage in an amount to be determined.

## COUNT II
## FALSE CLAIMS ACT – FALSE RECORD OR STATEMENT

125. Relator incorporates by reference Paragraphs 1 though 124 of this Complaint.

126. Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States and State of Michigan governments, which claims were false or fraudulent by virtue of Defendants' violation of the federal and state laws and regulations governing Medicare and Medicaid and the CMPL contrary to Defendants' simultaneous certification, or implied certification, to the United States

and State of Michigan governments that Defendants were in compliance with the Medicare and Medicaid laws, the CMPL and other federal and state health care laws, thereby violating the False Claims Act and the Michigan Medicaid False Claims Act.

127. As depicted in the detailed General Allegations, Defendants submitted false statements to the federal and state governments including:

a. Billing for physician services when a physician did not provide services.

b. Operating Autumnwood without a Medical Director.

c. Allowing a non-physician to pose as a physician placing patients' safety at risk.

d. Billing Medicare and Medicaid for services not provided to patients.

128. The United States government and the State of Michigan were unaware of Defendants' improper and illegal conduct and made full payment on or approved the false or fraudulent claims, which resulted in damage in an amount to be determined.

**COUNT III**
**VIOLATIONS OF THE CIVIL MONETARY PENALTIES LAW**

129. Relator incorporates by reference Paragraphs 1 though 128 of this Complaint.

130. The provisions of 42 U.S.C. § 1320a-7a, which provisions are known as the Civil Monetary Penalties Law ("CMPL"), provide in relevant part as follows:

(a) Improperly filed claims

> Any person (including an organization, agency, or other entity, but excluding a beneficiary, as defined in subsection (i)(5) of this section) that–
>
> > (1) knowingly presents or causes to be presented to an officer, employee, or agent of the United States, or of any department or agency thereof, or of any State agency (as defined in subsection (i)(1) of this section), a claim (as defined in subsection (i)(2) of this section) that the Secretary determines–

> > * * * * *
> >
> > (B) is for a medical or other item or service and the person knows or should know the claim is false or fraudulent,
>
> * * * * *
>
> (5) offers to or transfers remuneration to any individual eligible for benefits under subchapter XVIII of this chapter, or under a State health care program (as defined in section 1320a-7(h) of this title) that such person knows or should know is likely to influence such individual to order or receive from a particular provider, practitioner, or supplier any item or service for which payment may be made, in whole or in part, under subchapter XVIII of this chapter, or a State health care program (as so defined);
>
> * * * * *
>
> (7) commits an act described in paragraph (1) or (2) of section 1320a-7b(b) of this title;
>
> > shall be subject, in addition to any other penalties that may be prescribed by law, to a civil money penalty of not more than $10,000 for each item or service (or, in cases under paragraph (3), $15,000 for each individual with respect to whom false or misleading information was given; in cases under paragraph (4), $10,000 for each day the prohibited relationship occurs; or in cases under paragraph (7), $50,000 for each such act). In addition, such a person shall be subject to an assessment of not more than 3 times the amount claimed for each such item or service in lieu of damages sustained by the United States or a State agency because of such claim (or, in cases under paragraph (7), damages of not more than 3 times the total amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of such remuneration was offered, paid, solicited, or received for a lawful purpose). In addition the Secretary may make a determination in the same proceeding to exclude the person from participation in the Federal health care programs (as defined in section 1320a-7b(f)(1) of this title) and to direct the appropriate State agency to exclude the person from participation in any State health care program.

131. In short, an individual or entity, excluding a federal health care program beneficiary, is subject to the penalties and assessments of the CMPL and to exclusion from participation in any federal health care program when that individual or entity knowingly

presents or causes to be presented to the United States government a claim for an item or service and the person knows or should know the claim is false or fraudulent.

132. Defendants are also liable under the CMPL for actions of its agent-employees committed within the scope of the agency or employment. *See* 42 U.S.C. § 1320a-7a(l).

133. As required by law, Defendants expressly certified to the government that Defendants were in compliance with all federal health care law, and relied upon that certification to obtain reimbursement from Medicare, Medicaid, and other federal health care programs for goods, facilities, services, or items provided to one or more federal health care beneficiaries.

134. Defendants also implicitly certified to the government that Defendants were in compliance with all federal health care law, and relied upon that certification to obtain reimbursement from Medicare, Medicaid, and other federal health care programs for goods, facilities, services, or items provided to one or more federal health care beneficiaries.

135. As depicted in the detailed General Allegations, Defendants submitted false statements to the federal and state governments including:

a. Billing for physician services when a physician did not provide services.

b. Operating Autumnwood without a Medical Director.

c. Allowing a non-physician to pose as a physician placing patients' safety at risk.

d. Billing Medicare and Medicaid for services not provided to patients.

136. Defendants performed the above illegal and improper acts and also directed its agents and employees to commit the same illegal and improper acts in the course of, and within the scope of, their employment.

137. If the United States and State of Michigan governments had been aware of Defendants' improper and illegal conduct, including the false certifications, the government would not have made payment on or approved Defendants' claims for reimbursement under Medicare, Medicaid, and other federal or state health care programs.

138. By agreement and by law, Defendants were required to comply with all federal health care law, the CMPL, and the rules and regulations of Medicare, Medicaid, and the United States Department of Health and Human Services. Defendants acted with actual knowledge, deliberate ignorance, and/or reckless disregard in submitting false or fraudulent claims to the government and in providing remuneration to influence federal or state health care beneficiaries to order or receive goods from a particular supplier.

139. As a result of Defendants' false and fraudulent certifications and claims for reimbursement, Defendants have violated the False Claims Act, the Michigan Medicaid False Claims Act and the CMPL and has caused the United States and the State of Michigan to suffer damages.

**COUNT IV – RETALIATION AS TO DEFENDANT CIENA AND QAZI**

140. Relator incorporates by reference paragraphs 1 through 139 of this Complaint.

141. Defendants Ciena and Qazi harassed, retaliated and discriminated against Relator resulting in her baseless discipline and termination from her job in retaliation for her efforts to investigate and her report of fraud to Defendant Ciena and its agents/employees.

142. Defendants Ciena and Qazi's actions against Relator caused her injuries, including loss of past and present wages and benefits and past, present and future personal injuries including but not limited to mental distress and anguish.

143. Defendants Ciena and Qazi's actions were carried out in a deliberate manner and conscious disregard of Relator's rights and were malicious, despicable and were intended to harm Relator. Relator is thereby entitled to punitive damages against Defendants in an amount sufficient to punish Defendant and exemplary damages to deter future similar conduct.

## PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of herself and of the United States and the State of Michigan, requests judgment as follows:

A. The United States and the State of Michigan are entitled to reimbursement of the funds obtained by DEFENDANTS as a result of fraudulent claims submitted to the United States and the State of Michigan.

B. The United States is entitled to a civil penalty of $5,500 to $11,000, adjusted for inflation, for each false or fraudulent claim plus 3 times the damages sustained by the United States as a result of the false or fraudulent claims. *See* 31 U.S.C. § 3729(a); 28 C.F.R. 85.3(a)(9).

C. The United States is entitled to a civil monetary penalty of $10,000 to $50,000 for each violation of the CMPL, plus an assessment of not more than 3 times the amount of each false or fraudulent claim without regard to damages actually sustained by the United States. *See* 42 U.S.C. § 1320a-7a(a).

D. The United States is entitled to exclude DEFENDANTS from participation in any federal health care program. *See* 42 U.S.C. § 1320a-7(b)(7).

E. Judgment against DEFENDANTS for Relator in two times the amount of any loss of back pay, future wage loss, past and future loss of benefits, compensatory damages, including mental damages, exemplary damages and punitive damages, litigation costs and reasonable attorneys' fees.

F. Reinstatement with the same seniority status Relator would have had but for the wrongful suspension and discrimination she experienced.

G. An order of partial distribution pursuant to the Federal False Claims Act and the Michigan Medicaid False Claims Act, to the Qui Tam Plaintiff equivalent to a percentage of the judgments recovered against DEFENDANTS, plus their costs and attorneys' fees.

**DEMAND FOR TRIAL BY JURY**

NOW COMES Plaintiff-Relator, Deborah J. Smith, on behalf of herself and the United States of America and the State of Michigan, by and through her attorneys, HERTZ SCHRAM PC, and hereby demands a jury trial in the above-captioned matter.

Respectfully submitted,

s/ Patricia A. Stamler
HERTZ SCHRAM PC
1760 S. Telegraph Road, Suite 300
Bloomfield Hills, MI 48302
(248) 335-5000
pstamler@hertzschram.com
P35905

Dated: August 3, 2009
S:\Stamler, Patricia\Smith, Deborah 8575-1\Pleadings\Complaint.doc